# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MISSOURI

# EASTERN DIVISION

|  |  |
|---|---|
| MADJID BENCHABANE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LMI AEROSPACE, INC., GERALD E. DANIELS, JOHN S. EULICH, DANIEL G. KORTE, SANFORD S. NEUMAN, JUDITH W. NORTHUP, JOHN M. ROEDER, STEVEN SCHAFFER, GREGORY L. SUMME, and LAWRENCE RESNICK.<br><br>Defendants, | X<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **JURY TRIAL DEMAND**<br>) |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Madjid Benchabane ("Plaintiff"), individually and behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff bring this class action on behalf of the public stockholders of LMI Aerospace Incorporated ("LMI" or the "Company") against LMI's Board of Directors (the

1

"Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a),  and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Sonaca S.A., through its subsidiaries Sonaca USA Inc. ("Sonaca USA"), Luminance Merger Sub, Inc., ("Merger Sub") (collectively, with Sonaca S.A. and Sonaca USA, "Sonaca").

2.      On February 17, 2017, LMI and Sonaca announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Sonaca will acquire all of the outstanding shares of common stock of LMI for $14.00 per share (the "Merger Consideration"), in cash (the "Proposed Transaction").  The Proposed Transaction is expected to close in mid-2017.

3.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the U.S. Securities and Exchange Commission ("SEC") on March 15, 2017.  The Proxy recommends that LMI shareholders vote in favor of the Proposed Transaction whereby Merger Sub will merge with and into LMI, and become a wholly owned subsidiary of Sonaca.

4.      The Proposed Transaction was approved by a conflicted Board, which stands to receive windfall financial benefits from the automatic vesting of restricted stock and stock options. Thus, while the consideration LMI's shareholders are to receive is inadequate, the Board and the Company's executive management will profit substantially from the Proposed Transaction.

5.      Notably, on October 13, 2016, LMI announced that it had delivered the first of its aileron[1] and flap assemblies to Honda Aircraft Company ("Honda"), to be utilized in Honda's first aircraft the Honda HA-420 HondaJet ("HondaJet"). One analyst that covers advances in aviation

---

[1] An aileron is a hinged flight control surface usually forming part of the trailing edge of each wing of a fixed-wing aircraft.

remarked that the HondaJet is a "game-changer for the business aviation market" and expects the jet to "foreshadow a wholesale change in the business aviation marketplace," echoing what Honda and Toyota had done to the automobile industry in the 1970's.[2] By entering into the Proposed Transaction, however, LMI stockholders will not be able to share in the Company's success and profits.

6.     Defendants have now asked LMI's shareholders to support the Proposed Transaction in exchange for inadequate consideration based upon the materially incomplete and misleading representations and information contained in the Proxy, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Specifically, the Proxy contains materially incomplete and misleading information concerning the financial analyses conducted by Lazard Frères & Co. LLC ("Lazard"), LMI's financial advisor.

7.     To ensure no competing bidders emerge, defendants have also agreed to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, pursuant to the Merger Agreement, defendants agreed to: (i) a strict no-solicitation provision beginning after a brief "go-shop" period, that prevents the Company from soliciting other potential acquirers or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that provides Sonaca with four (4) business days to match any competing proposal in the event one is made; and (iii) a termination fee of $10 million payable to Sonaca by LMI if the Company decides to pursue a superior offer prior to the end of the go-shop period, and a termination fee of $15 million payable to Sonaca by LMI if the Company decides to pursue a superior offer after the end of the go-shop

---

[2] *See* Kathryn Creedy, *HondaJet Is A Game-Changer For The Business Aviation Market*, Forbes (Dec. 14, 2015, 2:34 PM), https://www.forbes.com/sites/kathryncreedy/2015/12/14/hondajet-the-one-to-beat-changes-the-business-aviation-aircraft-market/#790a332454fd

period.

8.      These deal protection provisions, particularly when considered collectively, substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of LMI.

9.      For these reasons, and as set forth in detail herein, Plaintiffs seek to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to LMI's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to LMI's shareholders.   In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

**PARTIES**

10.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of LMI.

11.      LMI is a corporation organized and existing under the laws of the State of Missouri, and maintains its principal executive offices at 411 Fountain Lakes Blvd., St Charles Missouri 63301.

12.      Defendant Gerald E. Daniels ("Daniels") has served as a Director of the Company since July 2014. Daniels was appointed Chairman of the Board of Directors on April 30, 2015, and is a member of the Audit Committee. According to the Company's Proxy Statement, Daniels is the beneficial owner of 20,635 shares of LMI common stock, as well as 14,980 shares under stock options.  Upon consummation of the Proposed Transaction, Daniels will be entitled to receive

approximately $288,890 from his common stock and $209,720 in gross proceeds from stock options, totaling $498,610 in gross proceeds.

13.     Defendant John S. Eulich ("Eulich") has served as a Director of the Company since August 2005, and serves as chair of the Corporate Governance & Nominating Committee, and a member of the Audit and the Compensation Committee. According to the Company's Proxy, Eulich is the beneficial owner of 39,425 shares of LMI common stock, as well as 12,874 shares under stock options.  Upon consummation of the Proposed Transaction, Eulich will receive $551,950 from his common stock and $180,236 in gross proceeds from stock options, totaling $732,186 in gross proceeds.

14.     Defendant Daniel G. Korte ("Korte") has served as a Director of the Company since August 2014 and had originally joined the Company as Chief Executive Officer in March 2014. According to the Proxy, Korte beneficially owns 38,250 shares of the Company's common stock and 150,026 shares under stock options.  Upon consummation of the Proposed Transaction, Korte will be entitled to receive approximately $535,500 from his common stock and $2,100,364 in gross proceeds from stock options, totaling $2,635,964 in gross proceeds. Korte recused himself from voting on the Merger Agreement because he and Sonaca entered into prospective employment agreements in which Korte is to be paid an annual salary and receive an initial bonus of $750,000 to be paid within five days of the closing of the Proposed Transaction.

15.     Defendant Sanford S. Neuman ("Neuman") has served as a Director of the Company and Assistant Secretary since 1984 and is also a member of the Corporate Governance & Nominating Committee. According to the Proxy, Neuman beneficially owns 266,553 shares of the Company's common stock and 7,022 shares under stock options.  Upon consummation of the Proposed Transaction, Neuman will be entitled to receive approximately $3,731,742 from his

5

common stock and $98,308 in gross proceeds from stock options, totaling $3,830,050 in gross proceeds.

16.     Defendant Judith W. Northup ("Northup") has served as a Director of the Company since May 2006 and also serves as chair of the Compensation Committee. According to the Proxy, Northup beneficially owns 35,025 shares of the Company's common stock and 8,192 shares under stock options.  Upon consummation of the Proposed Transaction, Northup will be entitled to receive approximately $490,350 from her common stock and $114,688 in gross proceeds from stock options, totaling $605,038 in gross proceeds.

17.     Defendant John M. Roeder ("Roeder") has served as a Director of the Company since 2003 and is chair of the Audit Committee. According to the Proxy, Roeder beneficially owns 47,701 shares of the Company's common stock and 13,459 shares under stock options.  Upon consummation of the Proposed Transaction, Roeder will be entitled to receive approximately $667,814 from his common stock and $188,426 in gross proceeds from stock options, totaling $856,240 in gross proceeds.

18.     Defendant Steven Schaffer ("Schaffer") has served as a Director of the Company since March 2015 and is a member of the Audit Committee and the Compensation Committee. According to the Proxy, Schaffer beneficially owns 1,231 shares of the Company's common stock and 17,832 shares under stock options.  Upon consummation of the Proposed Transaction, Schaffer will be entitled to receive approximately $17,234 from his common stock and $249,648 in gross proceeds from stock options, totaling $266,882 in gross proceeds.

19.     Defendant Gregory L. Summe ("Summe") has served as a Director of the Company since July 2014 and is a member of the Compensation Committee and the Corporate Governance & Nominating Committee. According to the Proxy, Summe beneficially owns 10,528 shares of

the Company's common stock and 7,022 shares under stock options. Upon consummation of the Proposed Transaction, Schaffer will be entitled to receive approximately $147,392 from his common stock and $98,308 in gross proceeds from stock options, totaling $245,700 in gross proceeds.

20.     Defendant Lawrence Resnick ("Resnick") has served as a Director of the Company since January 2017. According to the Proxy, Resnick beneficially owns 2,880 shares of the Company's common stock and 3,483 shares under stock options. Upon consummation of the Proposed Transaction, Resnick will be entitled to receive approximately $40,320 from his common stock and $48,762 in gross proceeds from stock options, totaling $89,082 in gross proceeds.

21.     Defendants Daniels, Eulich, Korte, Neuman, Northup, Roeder, Schaffer, Summe and Resnick are collectively referred to herein as the Individual Defendants and/or the Board.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

23.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) LMI maintains its primary place of business in this District; (iii) a

substantial portion of the transactions and wrongs complained of herein, including Defendants'
primary participation in the wrongful acts detailed herein, occurred in this District; and (iv)
Defendants have received substantial compensation in this District by doing business here and
engaging in numerous activities that had an effect in this District.  Venue is also proper in this
District because on February 2, 2017, the Individual Defendants approved an amendment to the
Company's Amended and Restated By-Laws which designates this Court as the exclusive forum
for suits of this nature.

## CLASS ACTION ALLEGATIONS

25.     Plaintiff brings this action on his own behalf and as a class action on behalf of all
owners of LMI common stock and their successors in interest, except Defendants and their
affiliates (the "Class").

26.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As
of March 14, 2017, LMI has approximately 13.29 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the
following:

(i)     Whether Defendants have violated Section 14(a) of the Exchange
Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of
the Exchange Act; and

(iii)   Whether Plaintiff and other members of the Class would suffer
irreparable injury were Defendants to file a Definitive Proxy with
the SEC that does not contain the material information referenced

8

above and the Proposed Transaction is consummated as presently anticipated.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  Company Background

27.     Founded in 1948 and headquartered in St. Charles, Missouri, LMI provides structural assemblies, kits and components, and design engineering services to the aerospace and defense markets in the United States. The Company's Aerostructures segment fabricates, machines, finishes, integrates, assembles, and kits machined and formed close-tolerance aluminum, specialty alloy and composite components, and assemblies. Its products include wing

slates and flap skins and/or components, ailerons, and verticals, among other things. Its Engineering Services segment offers engineering design, analysis, repair, certification, and program management services.

28.     The Company is currently poised for success and has benefitted as of late due to new and renewed contracts with the Boeing Company ("Boeing"), among others. Company management has made its confidence in the Company well known. For instance, on March 9, 2016, the Company held an earnings call discussing its full year 2015 and fourth quarter 2015 results, where Defendant Korte stated that he was "excited by what the future holds." Defendant Korte was right to be anxiously looking forward to the future of the Company. In 2015, LMI was able to expand its customer base by "winning our first Aerostructures contract on a new light business jet program." At the time, the Company was unable to announce who was producing the jet program, but the investing public would later find out that it was in fact Honda's HondaJet.

29.     Additionally, the Company secured more contract work with: Airbus SAS ("Airbus") on its A320 and A350 programs, Boeing on its 737 Max program, General Dynamics Corporation ("General Dynamics") on its Gulfstream G500 and G600 programs, and Spirit Aerosystems ("Spirit"). On its collaboration with Spirit, Defendant Korte stated that "Spirit named us strategic partner of the year, a major achievement with our largest customers."

30.     For the fourth quarter of 2015, LMI generated $89.4 million of revenue with a net loss of $1.2 million or $0.09 per fully diluted share. Operating income in the fourth quarter was $4.5 million as compared to a loss of $23.4 million for the fourth quarter of the previous year. The Company was able to finish the year by generating $25.4 million of free cash flow in the fourth quarter.

31.     The Company began 2016 on a strong note. In an earnings call discussing the

Company's first quarter results held on May 9, 2016, Defendant Korte started off by discussing

LMI's promising positioning for the future:

> [W]e are planning for the future and a significant ramp-up in production volume [is] expected over the coming years. In this regard, we plan to expand our 5-axis machining center of excellence in Washington, Missouri beginning later this year, pending the city's final approval of our incentive package. This expansion will provide us the capacity needed to handle the increased demand commensurate with Boeing build rates and our higher content on the 737 Max. With this Boeing content, our work on the Gulfstream 500/600 series **and our recent wins on the new light business jet program, we are well-positioned for significant growth**….

(Emphasis added).[3]

32.     Defendant Korte reiterated his confidence in LMI as a standalone Company

throughout the earnings call:

> We have a relatively new management team **with strong leaders who bring more than 120 years of aerospace and defense industry experience.** And our leadership, employees and Directors combined own nearly 20% of the company. **We are winning new content with marquee customers such as Boeing, Spirit and Gulfstream on a variety of exciting platforms that should fuel substantial Aerostructures growth in the coming years.** At the same time, we continue to manage costs across our operations and drive margin expansion. And we have been implementing a new business strategy to reinvigorate Engineering Services revenue growth and profitability. We are also using cash to reduce debt and strengthen our balance sheet. So all-in-all, **we are well positioned for improved shareholder value.**

33.     As for LMI's financial results in the first quarter of 2016, LMI generated $87.3

million in revenue and had a net loss of $1.8 million for the quarter or $0.14 per fully diluted share,

as compared to $92.5 million in revenue and a net loss of $1.5 million or $0.11 per fully diluted

share in the same period of 2015. Operating income for the first quarter was $3.4 million as

compared to $4.3 million in the corresponding quarter of 2015.

34.     On August 8, 2016, the Company held an earnings call in which it discussed its

second quarter 2016 results. Defendant Korte announced that the Company was experiencing some

---

[3] Unless indicated otherwise, all emphasis has been added to the original quotation.

unperceived difficulties in the industry, and stated that 2016 "is proving to be more challenging than previously thought." However, LMI was not affected disproportionately from the other companies competing in the aerospace segment. The main reason causing the slowdown was the fact that certain legacy models were being produced less and taken out of rotation more often and sooner than previously expected. Despite these difficulties, Defendant Korte stated that "Bottom line, we remain on track for higher growth going forward…."

35.     In the second quarter of 2016, the Company generated $84 million in revenue and had a net loss of $29.9 million for the quarter or $2.28 per fully diluted share. The reason for the net loss was mostly due to a $28.4 million pre-tax, non-cash impairment charge.

36.     On November 11, 2016, the Company held an earnings call in order to discuss its third quarter results for 2016. Defendant Korte stated that the third quarter showed improvement across the board in "revenue, operating profit, and net income from the previous three quarters" which "demonstrates momentum with regard to our growth plans and our initiatives to improve bottom line results."

37.     For the first time on a conference call, Defendant Korte was permitted to discuss the fact that the Company had landed a potentially very lucrative contract with Honda for the HondaJet. Defendant Korte was able to go into detail regarding the importance of the HondaJet for the Company:

> The HondaJet **offers a great new platform for growth and customer diversification.** Our wins on the HondaJet ailerons, flap assemblies, and engine pylons, would not have been possible without the existing customer relationships with our engineering services business and our Aerostructures' expertise in complex flight surface assemblies. Our HondaJet work showcases some of the best of what LMI can do in engineering, metal forming, machining, processing and assembly. **It's really exciting to be working with Honda Aircraft Company, and we see opportunities and do even more with them going forward.**

38.     Defendant Korte ended his portion of the earnings call with a particularly uplifting

outlook on the future of the Company as an ongoing independent affair:

> Overall, I believe this quarter shows the stability we saw this year even as we **prepare for much brighter days ahead**. We've laid out a vision for 2017 and beyond, including revenue guidance for next year. We continue to see Aerostructures' achieving 10% compounded annual revenue growth through 2018, based on the many new platforms I previously discussed, including Gulfstream, Boeing and HondaJet.
>
> Ramping up for this growth while managing costs takes discipline and superior operational execution, cornerstones of LMI's approach; when we think about where LMI will be a year from now, and two years from now with many new platforms, much greater content, a streamlined cost structure, improved balance sheet and reduced interest expense, **we feel good about our future. We simply need to continue to manage costs, win new business, and execute on what we've already won; and that's exactly what we plan to do.**

39.     For the third quarter of 2016, the Company generated $89.7 million in revenue with a net income of $0.3 for the quarter or $0.02 per fully diluted share. Operating income for the third quarter was $5.7 million as compared to $6.1 million in the third quarter of 2015.

**B.  LMI Conducts A Flawed Sales Process**

40.     As discussed in depth, *inter alia,* the negotiations leading up to the signing of the Merger Agreement were flawed for at least four reasons: (1) LMI's actual enterprise value was much higher than the final agreed upon $14.00 per share; (2) conflicts of interest infested the Board's deliberations; (3) Defendant Korte orchestrated the entire transaction with Bernard Delvaux ("Delvaux"), and then recused himself to try to dispel the appearance of impropriety; (4) the hollow go-shop period was designed to be and was purposefully ineffective.

41.     Despite LMI's recent success including garnering increased contract work from Boeing and the excitement surrounding production and commercial sales of the HondaJet, LMI led a flawed process designed to sell the Company to Sonaca, in spite of the fact that certain key developments during negotiations deflated the enterprise value of LMI. On January 31, 2017, at which time the negotiations were hovering at $15.00 per share, the Board was updated on the

preliminary financial results for the fourth quarter of 2016 that "indicated an earnings shortfall and higher net debt balance relative to expectations." Next, on February 6, 2017, the Board was informed of "certain letters" from a major customer complaining of the Company's quality of work under their current contract. The Board was forced to disclose these performance issues to Sonaca's representative on February 8, 2017. These two issues worked in conjunction to decrease the Merger Consideration from $15.00 to $14.00 per share.

42.      Conflicts of interest were rampant throughout the negotiation of the Merger Agreement because Defendant Korte knew as early as December 16, 2016, that there was a strong likelihood that he would receive a very lucrative post-merger job offer. Although Defendant Korte recused himself from voting on the proposed Merger Agreement, he was able to use his influential position as Chief Executive Officer and Director to sway the other members of Board to his side. Defendant Korte was not the only member of LMI who had a potential job offer on the table. According to the Proxy, there were multiple instances throughout the negotiation of the Merger Agreement where employment arrangements were discussed involving "potentially certain other executives" of the Company. Notably, the Proxy fails to bring to light who these other executives were and whether these executives were ever informed about these positions during the negotiations.

43.      Defendant Korte and Delvaux negotiated the terms of the Merger Agreement and the post-merger employment contracts throughout the process. Defendant Korte was able to guarantee ownership of the Company to Delvaux and Sonaca and in the process guarantee himself a lucrative post-employment contract and a cash-out of all of his interest in LMI's stock. Notably, the terms of the Merger Agreement were supposed to be negotiated by the "Sunburst Committee", consisting of Defendants Daniels, Eulich, Summe, and later Resnick. The Sunburst Committee

was supposed to be independent and evaluate the potential transaction. The terms of the employment contracts, were supposed to be negotiated by the "Compensation Committee," also supposedly comprised of independent directors. However, as explained below, Defendant Korte negotiated both of these items and then recused himself, but at that point the damage had been done.

44.     As described in the Proxy, the inadequate Merger Consideration is the result of a flawed sales process during which the Board engaged solely with representatives of Sonaca, and despite the execution of a go-shop provision, did not seriously negotiate or open the Company up to any other bidders.

45.     On November 4, 2016, a representative from Sonaca, contacted Defendant Summe regarding a potential strategic transaction. On November 12, 2016, the Board held a meeting with Lazard and its legal advisor Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), present. The Board established the Sunburst Committee, supposedly to have only independent directors negotiate the terms of the Merger Agreement. Despite the fact that the Sunburst Committee had been created to negotiate the terms on behalf of the entire Board, on the next day Defendant Korte called and talked to Sonaca's representative Delvaux.

46.     The Company decided to grant Sonaca exclusivity on November 23, 2016, even though Sonaca had only offered an initial value of $11.00 to $12.50 per share, which grossly undervalued LMI. The Company exchanged initial due diligence information with Sonaca on November 24, 2016. On December 5, 2016, Sonaca submitted a revised indication letter addressed to Defendants Daniels and Korte indicating a price per share of $12.50 to $13.75 per share. The Company decided to grant an eleven day exclusivity period extension based on this indication.

47.     On December 16, 2016, Delvaux sent a letter to Mr. Daniels with a revised

indication of interest to acquire the Company at a value range of $13.00 to $16.00 per share. The letter also indicated that Sonaca would include in the Proposed Transaction an employment agreement with Defendant Korte, the terms of which would not expire until at least December 31, 2019. The Board entered into another confidentiality agreement with Sonaca on December 19, 2016, where the Company granted exclusivity until January 22, 2017.

48.     During this exclusivity period, Defendant Korte and Delvaux met and had dinner together in St. Louis, Missouri. At the time there was already an offer on the table to employ Defendant Korte after the Proposed Transaction. The Proxy fails to disclose why the Compensation Committee did not take over the negotiation of post-merger employment. Instead, Korte continued to negotiate his employment at a dinner party with Delvaux. At this meeting Defendant Korte and Mr. Delvaux discussed the Merger Agreement negotiations generally and the two envisioned Defendant Korte working after the Proposed Transaction was consummated. The Proxy fails to disclose why the Sunburst Committee did not take over control of the Merger Agreement negotiations before or at this time.

49.     Defendant Korte and Mr. Delvaux spoke periodically between January 18 and January 27, 2017 about "potential compensation structures for the Company leadership team following a transaction." The Proxy fails to disclose which members of the leadership team were included in these discussions, whether these members were Directors of the Company tasked with voting on the Merger Agreement, and whether members of the leadership team were informed of these discussions. Most baffling, was why the Compensation Committee was not included on this series of phone calls. The Proxy even fails to disclose whether the Compensation Committee was told of these discussions. It seems that even if they were, the Compensation Committee would be inclined to side with Defendant Korte who holds the influential positions of Chief Executive

16

Officer and Director.

50.     On January 28, 2017, the full Board of LMI held a meeting and decided to reject
Sonaca's recent proposal of $14.00 per share and counter at $15.00 per share. On January 31, 2017,
the Board had a meeting where it discussed certain disappointing fourth quarter results. These
results were especially disappointing considering the Company's recent success and the position
it gained in the aerospace market. Specifically, the Company's actual debt was about $10 million
higher than that of management forecasts. On February 2, 2017, the Board received Sonaca's "best
and final" offer of $14.50 per share.

51.     On February 3 and February 4, 2017, Defendant Korte again discussed the
employment agreements that were to be executed by Defendant Korte and Clifford C. Stebe, Jr.,
the Company's Chief Financial Officer ("Stebe"), following the Proposed Transaction. Defendant
Korte was actively and solely negotiating the post-merger employment agreements even though
the Proxy claims that the negotiations "were being directed and overseen and would be subject to
review and approval by the Compensation Committee."

52.     On February 6, 2017, the Board internally discussed that representatives from
Sonaca felt as though the updated fourth quarter results for 2016, including the increased debt
amounts, necessitated a decrease in the Merger Consideration from $0.75 to $1.00 per share. On
February 8, 2017, the Company communicated to members of Sonaca that "certain performance
issues had recently been brought to the Company's attention by one of its customers." Proceeding
on these two negative developments, Sonaca submitted a revised proposal at $13.75 per share.
Shortly thereafter the Company and Sonaca settled on a final price of $14.00 per share. On
February 16, 2017, the Company and Sonaca entered into the Merger Agreement.

53.     The signing of the Merger Agreement triggered the start of a 30 day go-shop

period. On February 17, 2017, Lazard reached out to fifty-two parties "with likely strategic interest in the Company". The Proxy does not disclose how these parties were chosen. According to the Proxy, only two of these likely parties reached out to LMI. These two parties, Company A and Company B, were provided access to any due diligence materials. The Proxy does not disclose whether Companies A and B made an offer to acquire LMI, at what price range, or the level of interest shown by each Company.   Company C reached out to LMI, even though it was not included in the "likely" list of parties. Company C was interested in negotiating, but declined to sign the form standstill provision as contained in the Company's confidentiality agreement. Company C sent a revised confidentiality agreement to LMI on February 28, 2017. On March 1, 2017, the very next day, the Company decided to end all discussions with Company C and instead focus on filing the Proxy "as soon as possible." On March 6, 2017, Company A and Company B both fell out of the running.

### C.  The Proposed Transaction is Announced For Inadequate Consideration

54.     In a press release dated February 2, 2017, LMI announced that it had entered into the Merger Agreement pursuant to which Sonaca will acquire all of the outstanding shares of common stock of LMI for $14.00 per share. The press release states, in relevant part:

**LMI Aerospace Enters into Merger Agreement to be Acquired by Sonaca Group**

ST. LOUIS, Feb. 16, 2017 (GLOBE NEWSWIRE) -- LMI Aerospace Inc. (Nasdaq:LMIA) has entered into a merger agreement to be acquired by Sonaca Group, a global aerostructures company headquartered in Gosselies, Belgium. Under the agreement, LMI shareholders will receive $14 per share in an all-cash transaction. Sonaca's offer represents a 52 percent premium over LMI's closing share price on Feb. 16, 2017, of $9.19 per share, a 63 percent premium over LMI's 3-month volume weighted average price up to and including Feb. 16, 2017, of $8.59 per share, and a 78 percent premium over LMI's 6-month volume weighted average price up to and including Feb. 16, 2017, of $7.88 per share.

In connection with the merger agreement, Sonaca has obtained debt and equity financing commitments. The merger agreement, however, does not include, and the consummation of the merger is not conditioned upon satisfaction of, a financing condition.

"This deal brings our combined company to the forefront as a leader in the design and manufacture of complex aerostructures while working to diversify our global customer base," said Dan Korte, LMI Aerospace chief executive officer. "In addition, LMI and Sonaca have complementary product portfolios while largely serving different aerospace primes and Tier 1 suppliers around the world, enabling us to better serve our customers."

"The addition of LMI Aerospace to the Sonaca Group supports our vision to expand our capabilities in the United States," said Bernard Delvaux, Sonaca chief executive officer. "Sonaca and LMI have both distinguished themselves in the industry through capabilities such as wing movables, wing panels, complex fuselage and structural assemblies, and together we will be able to strengthen our competitive advantage in the global aerospace market."

LMI's independent directors unanimously approved the transaction. The deal is expected to close mid-2017, subject to LMI shareholder approval as well as certain regulatory approvals and other customary closing conditions.

Upon transaction close, LMI will operate as LMI Aerospace – A Member of the Sonaca Group, with headquarters remaining in St. Louis. Korte will continue to serve as LMI Aerospace CEO and will report directly to Delvaux. Other members of the LMI senior leadership team also will remain in place and will continue their current reporting relationships. The company will continue investing in its current footprint, continuously improving its U.S. and worldwide infrastructure and the capabilities of its teams.

Lazard served as financial advisors and Gibson, Dunn & Crutcher LLP and Polsinelli PC served as legal advisors to LMI. Credit Suisse served as financial advisors and Arnold & Porter Kaye Scholer and Husch Blackwell served as legal advisors to Sonaca.

**D.  The Preclusive Deal Protection Devices**

55.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a fait accompli and ensure that no competing offers will emerge for the Company.

56.     By way of example, § 6.02(b) of the Merger Agreement includes a "No Solicitation" provision barring the Board and any Company personnel from attempting to procure a price in excess of the amount offered by Sonaca, after the ending of the thirty day go-shop period.

57.     Pursuant to § 6.02(c) of the Merger Agreement, should an unsolicited bidder arrive on the scene after the ending of the go-shop period, the Company must notify Sonaca of the bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, Sonaca must be provided with written notice that the Board intends to enter into an Acceptable Confidentiality Agreement or participate in discussions or negotiations with the unsolicited bidder. Sonaca is able to match the unsolicited offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the unsolicited offer.

58.     In other words, after the closing of the go-shop period, the Merger Agreement gives Sonaca access to any rival bidder's information and allows Sonaca a free right to top any superior offer.

59.     In addition, Pursuant to § 8.05 (a) of the Merger Agreement, LMI must pay Sonaca a termination fee of: (1) $10 million if the Company accepts a superior proposal made before the end of the go-shop end date; and (2) $15 million if the Company decides to pursue another offer, at any time after the end date. The applicable termination fee during the go-shop period essentially requires any party to pay a $10 million naked premium to LMI for the right to provide the shareholders with a superior offer.

60.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board

may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**E.  The Individual Defendants Stand To Receive Personal Financial Gains That LMI Shareholders Will Not Benefit From**

61.     Each of the Individual Defendants will reap personal financial gain if the Proposed Transaction is consummated.  Thus, they each have a personal interest to ensure that LMI's shareholders vote to approve the Proposed Transaction.

62.     Specifically, each of the Individual Defendants will receive significant cash payments as a result of the accelerated vesting of their restricted stock.  As a result of this personal benefit, Individual Defendant Neuman will receive a payment of more than $3.8 million, and the remaining director Individual Defendants will each receive a payment ranging from $89,082 to $2,635,964.

63.     Individual Defendant Korte, who led the flawed sales process, will also receive an annual salary and an initial bonus of $750,000 within five days of the closing of the Proposed Transaction due to the post-merger employment contract he negotiated for himself.

64.     The inadequate sales process was thus tainted by these personal financial benefits which are unique to the Individual Defendants and not shared by LMI's public shareholders.  It is therefore imperative that LMI's shareholders receive the material information referenced below, so that the can cast a fully informed vote on the Proposed Transaction.

**F.  The Materially Incomplete and Misleading Proxy**

65.     On March 15, 2017, Defendants filed the Proxy with the SEC.  The information contained in the Proxy has thus been disseminated to LMI shareholders to solicit their vote in favor of the Proposed Transaction.  The Proxy omits certain material information concerning the fairness

21

of the Proposed Transaction and Merger Consideration. Without such information, LMI shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

66.     First, the Proxy fails to disclose what effect two significant developments had on the Board's decision making process to enter into and approve the Merger Agreement. Specifically, on January 31, 2017, the Board learned that its financial results for the fourth quarter of 2016 were not as promising as they had predicted beforehand. Next, on February 6, 2017, the Board learned of "certain letters" criticizing the Company's body of work. As a result of these two factors, the current negotiating price of the parties dropped a full $1.00 in value. The Proxy fails to disclose whether the Board chose to accept a lower offer price in response to these two events and even more so if these two events were serious enough to warrant a $1.00 drop. Additionally, the Proxy fails to disclose if the Board had at this time contemplated remaining a standalone entity as a result of these developments.

67.     Next, the Proxy fails to disclose why the Sunburst Committee and the Compensation Committee failed to perform their roles in negotiating the Merger Agreement and post-merger employment agreements, respectively. The Proxy fails to disclose what roles these two supposedly independent Committees had in negotiating these agreements, if any besides rubber-stamping the final agreements that Defendant Korte provided to them. From the outward appearance of the Proxy, it seems that Defendant Korte negotiated the agreements and then recused himself once he had secured a lucrative employment contract.

68.     Also, with respect to post-merger employment contracts, the Proxy fails to explain which "certain other executives" within the Company were in the running to receive employment contracts from Sonaca. The Proxy specifically references a January 11, 2017 dinner meeting

between Korte and Delvaux where this was discussed but fails to provide any names. The Proxy fails to explain whether these executives knew of the possibility and whether they were members of either the Sunburst or Compensation Committee. The Proxy also mentions certain telephone conversations on January 18 and 27, 2017 between Korte and Delvaux and again on February 13, 2017, concerning "compensation structures" post-closing, but fails to disclose anything substantive concerning what was discussed.

69.     With respect to the go-shop period, the Proxy fails to give any detail into Company C's level of interest, besides the fact that Company C was not willing to sign the confidentiality agreement as it was presented. The Proxy also fails to disclose what "other changes" were made to the confidentiality agreement and whether Company C would have been willing to negotiate on the terms of a standstill provision. Finally, the Proxy fails to disclose whether any of the other fifty-two parties contacted showed any interest in a potential transaction, even if they did not enter into a confidentiality agreement.

70.     Disclose the Net Operating Loss ("NOL") projections, including both the actual balances and how they were utilized. As well as why the value of the NOL's was not considered in any analysis other than the DCF.

71.     Disclose the Unlevered Free Cash Flow projections for the January 2017 Plan. And reconcile those to management's projections. Also, provide the value of the NOL's under these projections.

72.     Furthermore, the Proxy omits critical information concerning the financial advisors' potential conflicts of interest. For instance, nothing is provided concerning what, if any, services Lazard has provided to the Company in the past and the compensation received, or to be received for these services. This information is critical for shareholders to be able to assess the

objectivity of Lazard and for shareholders to be able to decide what credence to give to the fairness opinion delivered to the Board.

73.     Defendants have knowingly, recklessly, or negligently omitted the above-referenced material information from the Proxy, in violation of the Exchange Act.  Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that LMI shareholders will suffer absent judicial intervention.

74.     In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

75.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

76.     Further, the Proxy indicates that on February 16, 2017, Lazard reviewed with the Board its financial analysis of the merger consideration and delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion also dated February 16, 2017, to the effect that the Merger Consideration was fair, from a financial point of view, to LMI shareholders.  Proxy at 61, 68.  Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Lazard's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

**CLAIMS FOR RELIEF**

## COUNT I

**On Behalf of the Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

78.     Defendants have filed the Proxy with the SEC with the intention of soliciting LMI

shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed

and authorized the dissemination of the Proxy, which fails to provide the material information

referenced above.

79.     In so doing, Defendants made materially incomplete and misleading statements

and/or omitted material information necessary to make the statements made not misleading.  Each

of the Individual Defendants, by virtue of their roles as officers and/or directors of LMI, were

aware of the omitted information but failed to disclose such information, in violation of Section

14(a).

80.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange

Act, provides that such communications with shareholders shall not contain "any statement which,

at the time and in the light of the circumstances under which it is made, is false or misleading with

respect to any material fact, or which omits to state any material fact necessary in order to make

the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

81.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or

should have known that the Proxy is materially misleading and omits material information that is

necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied

upon the omitted information identified above in connection with their decision to approve and

recommend the Proposed Transaction; indeed, the Proxy states that Lazard reviewed and discussed

its financial analyses with the Board during various meetings including on February 16, 2017, and further states that the Board relied upon Lazard's financial analyses and fairness opinion in connection with approving the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

82.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

### On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

83.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

84.     The Individual Defendants acted as controlling persons of LMI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of LMI and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

85.     Each of the Individual Defendants were provided with or had unlimited access to

26

copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

86.      In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Proxy.

87.      In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

88.      By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

89.      As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

90.      Plaintiff and the Class have no adequate remedy at law.  Only through the exercise

of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<strong>RELIEF REQUESTED</strong>

WHEREFORE, Plaintiff demands injunctive relief in their favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiffs as Class Representatives and their counsel as Class Counsel;

B.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to LMI shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

D.      Directing the Defendants to account to Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

E.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

<strong>JURY DEMAND</strong>

Plaintiffs demand a trial by jury.

Dated: March 27, 2017                                  **CAREY, DANIS & LOWE**


                                                      */s/James J. Rosemergy*
                                                      James J. Rosemergy, MO#50166
                                                      8235 Forsyth Blvd. Suite 1100
                                                      St. Louis, MO 63105
                                                      Tel: (314) 678-1064
                                                      Fax: (314) 721-0905
                                                      jrosemergy@careydanis.com

                                                      *Counsel for Plaintiff Madjid Benchabane*

**OF COUNSEL:**


**LEVI & KORSINSKY LLP**
Shane T. Rowley
Stephanie A. Bartone
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (212) 363-7171